All right, we have two cases for argument. We'll hear the arguments in the first case, and then we'll take a short sort of five-minute break to reconstitute the panel because there are some senior judges who are on the second case who are not on this one and be in place. But after we finish the arguments, just a brief five to reconstitute the panel, and then we'll crank up with the second case. All right. First case up, Planned Parenthood v. Phillips. Mr. Hawkins, you're on, and as I understand, you've waived any uninterrupted time. Is that correct? That's correct. I've waived that. You're on. Yes, sir. All right. Thank you, Chief Judge Stewart. May it please the Court. The Medicaid Act does not allow a Medicaid recipient to sue in federal court to block a state's disqualification of a Medicaid provider. This Court concluded the opposite in Gee, but that decision was wrongly decided and should be overruled today. Gee rests on two distinct legal errors. First, under Gonzaga and Armstrong, subsection 823 creates no clear and unambiguous right that can be enforced through section 1983. Second, under O'Bannon, Medicaid patients may not collaterally attack a state's decision as to which providers are qualified. Either of these two errors is a sufficient basis to overrule Gee and dismiss the individual plaintiff's claims. I'll start with Gonzaga and Armstrong. These cases together explain that Congress does not create a private right of action under section 1983 unless it speaks with a clear voice to clearly and unambiguously make a right so enforceable. Now, those cases depart from previous decisions, such as Wilder, which inferred a private right of action whenever a statute provided some benefit to a plaintiff. Counsel, if the Wilder blessing framework is still good law, how would that affect this argument? Well, two responses to that, Judge Rohlf. First, I would say first that Armstrong explicitly repudiated Wilder in the star footnote in section 3 of the majority opinion joined by five justices, so I don't think there's a If the blessing factors and the Wilder considerations were still relevant, it's still clear from Gonzaga and Armstrong that only a clear and unambiguous statement from Congress is sufficient to create a private right of action, and that clear and unambiguous statement is missing from subsection A23. There are four distinct clues in subsection A23 indicating that Congress did not intend to create a private right of action. First, the focus of A23 is on the Secretary of Health and Human Services, not on individuals who are receiving Medicaid services. Second, the phrasing of subsection A23 is in terms of what a state must do to procure funding from the Secretary. Third, the topic of subsection A23 is on choosing among qualified providers. It is not about determining who is qualified, and it is not about challenging a qualification decision. Fourth, and perhaps most importantly, Congress in 1396A has created two distinct enforcement mechanisms for a state's failure to comply with the statute. The Secretary can withhold funds from the state if the state is not complying with the orders of the Medicaid Act, and the provider plaintiffs, or rather a Medicaid provider who is disqualified, can bring an administrative action to challenge the state's disqualification decision. Now, when we take those distinct statutory clues together, we see that under the Armstrong-Gonzaga framework, there is no clear intent to create a private right of action. I want to go back to your comments about Wilder. As you know, just last year in Legacy, we said Wilder is not overturned. So would your position require us to overturn at least that part of Legacy? And also, what about decisions like COD that relied on the Wilder framework? What's left of those? Your Honor, we don't challenge the end result in Legacy, and the Court would not have to disturb its conclusion that it reached in Legacy that subsection BB creates a private right of action. We don't take issue with that today. But we do think that Legacy erred in portions of its reasoning. Legacy stated that Wilder has not been overruled. We think that's incorrect in light of the Supreme Court's decision, and Wilder set out in the star footnote, which, again, is part of the majority opinion. The Supreme Court stated that it repudiated Wilder's reasoning. The Supreme Court uses the terms repudiate and overrule interchangeably. And of course, there would be no occasion to formally overrule Wilder, which was interpreting Section 13A, the Boren Amendment, which was repealed by Congress in 1997 in the Balanced Budget Act. So there's no occasion to formally overrule Wilder. The closest the Supreme Court can come is to repudiate it, which it did in the Armstrong case in 2015 via that footnote. So to the extent that Legacy— What about COD? Oh, I'm sorry. Does that still stand with your reasoning? I'm sorry? The HUD decision, which found a 1983 claim under a different subsection of this Medicaid statute. Your Honor, that—again, that's another case where we don't challenge the final outcome, but we do challenge portions of the reasoning. The statement—any case that relies on Wilder is necessarily infirm because Wilder has been overruled. But that does not mean that the outcome is incorrect. Returning to Legacy, Legacy is interpreting subsection BB. That statute reads as a type of contract between the state and a federally qualified health plan. That statute just says the state has to pay the federally qualified health plan for the services it renders according to the formula that's developed by the federal government. It just seems like these—if your argument is correct that there's an alternative enforcement scheme, which is federal withdrawal of Medicaid funds, I mean, that's largely what Legacy in these cases turned on. Why wouldn't it wipe away a 1983 action? And, you know, maybe you're right. Maybe you're not. We'll figure that out. But it seems to me it would wipe away all these 1983 actions under this Medicaid statute if the alternative federal enforcement mechanism is sufficient. Well, Judge Costa, I don't doubt that some of this case—some of this Court's decisions would be incorrect under the Gonzaga and Armstrong framework. And, of course, many decisions that Your Honor refers to were decided before Armstrong, and they correctly relied on Wilder in that sense prior to the Supreme Court overturning it. But I think the important part of the Gonzaga and Armstrong inquiry is that it inherently turns on the language of any specific statute. So the fact that A23 does not create a private right of action does not necessarily mean that any other subsection within 1396A also does not create a private right of action. But what about O'Bannon itself? It said, presumably in dicta, that a patient or a beneficiary has the right to sue or has a right to a qualified provider. Well, it can't get into—it can't challenge the State's decision on whether the provider is qualified. They said more than once that there was a right to have a qualified provider. What do you do with that language in O'Bannon and the statutory language itself? Your Honor, that portion of O'Bannon is dicta. It's not central to the Court's holding. Your Honor, of course, is correct that the Court does indicate in O'Bannon that if A23 creates any right at all, it would be the right for a Medicaid patient to choose among qualified providers. Now, of course, O'Bannon reached that dicta without the benefit of Gonzaga and without the benefit of Armstrong. We think that applying the current test that the Supreme Court has set out in those two cases, O'Bannon would not. Well, how does the language in 23 differ, in your mind, from the language in Legacy which you said the outcome was correct? Well, Your Honor, just to be clear, I don't—we challenged the creation of a private right in Legacy. We simply don't—we don't ask the Court to overturn it today. The language is different in a key way. In subsection BB, Congress has created effectively a contract between a federally qualified health plan and the state. Subsection BB says the state has to pay the federally qualified health plan according to the reimbursement mechanism. There's no discretion baked into that at all. The Secretary plays no role in that process. It's just telling the state to do something, basically to act on a contract. So the Court reasoned in Legacy that it only makes sense that a federal— Where is the discretion in the qualified provider provision as long as the state has said you're qualified? In the word qualified, Your Honor, the state under the Medicaid Act has the discretion to determine the— But if the state has said you're qualified, where is the discretion for the state to say, well, we've said the provider is qualified, but we're not going to reimburse? Your Honor, in a situation like that, there would be two remedies built into Section 1396A. One is the Secretary could withhold funding. The second is the providers who were denied funding could bring an administrative action. So there are two enforcement mechanisms built into A23. When one looks at subsection BB, it does not refer itself to any distinct enforcement mechanism. It simply reads as contract and nothing within subsection BB itself says anything about an alternative enforcement mechanism. Well read in context of O'Bannon, it really wasn't focusing on the word qualified at all, was it? What it was saying was that the individual under this statute has a right to a provider and just not this provider, right? So what the statute guarantees the individual is providers who are qualified. It doesn't say who's qualified or unqualified, but it entitles them to care, not to decide or invoke the statute to say who is qualified. That's correct, Judge Jones.  And under the reading of O'Bannon that Your Honor just articulated, Ghee cannot stand because Ghee reaches a different conclusion. Don't we have to read O'Bannon in context also? O'Bannon was a case in which the Department of Health, Education, and Welfare had disqualified the nursing home for Medicare with a lot of due process. And so the people, the recipients in the home had the indirect benefit of all of that due process provided by the HEW, including access to administrative law judge appeal, et cetera. So it makes sense that they didn't really need any further evidentiary hearings to protect those people because they had already been indirectly protected along with the providers in the HEW proceeding. The Medicaid was hooked to the Medicare qualification. And so once the Medicare qualification was disallowed, then the Medicaid qualification automatically went with it. But by that point, all those people involved had been protected by all of the procedures of the HEW, which were quite elaborate. Your Honor, I don't agree with that reading of O'Bannon. I think what O'Bannon is saying is that there is no substantive right in the first place. And if there is no substantive right that can be protected, then what process one is entitled to for the deprivation of that right is irrelevant because there's no substantive right in the first place. This is the point that Judge Owen, I think, correctly explained in her dissent in the panel decision in Gee. O'Bannon holds that there's no substantive right to bring the challenge under A23. And in light of the fact that there's no right, the process that is afforded— You don't think the context—you don't think the context that I just alluded to makes any difference in our reading of practicability of the O'Bannon decision? Although the Court didn't go into that much detail about the HEW proceeding, it did cite to that other Third Circuit case that went into it very fully. And I just got to believe that the Supreme Court was influenced by the fact that all of those people had already had a very—had probably had as much due process as anybody could have. Your Honor, I don't think that's a fair reading of O'Bannon. I think that O'Bannon says that there is no substantive right that can be protected in this case. And without a substantive right, then the amount of process that's afforded is irrelevant because there is no substantive right in the first place. Counsel, if, in this case, Planned Parenthood had pursued its administrative remedies, could it have raised some of the issues that are raised in the briefing about whether the video is authentic and whether or not an affiliate is really an affiliate? Could all of those things have been hashed out in the administrative proceeding had they chosen to avail themselves of that? Absolutely, Judge Elrod. And that's an important point because it illustrates one of the problems with the plaintiff's position in this case. They had the opportunity to avail themselves of the remedies that are built into the Medicaid Act. They chose not to. And instead, they have enlisted individual Planned Parenthood patients as proxies to fight the fight that Your Honor just alluded to here in federal court. It's very difficult to believe that Congress intentionally created the possibility for parallel litigation tracts on the same substantive issue, namely, whether they are affiliates, whether they're qualified, whether the video is authentic. If plaintiffs are correct, then Congress has created two litigation tracts that could reach potentially inconsistent results. It's very difficult to believe that Congress would have wanted to do so without more evidence that that wasn't truly their intent. Let me ask you a procedural question. Even if we were to accept your arguments in this case, it's a limited appeal because it's from a plenary injunction. We could not actually dismiss the individual plaintiffs, even if we concluded they lacked standing on the statute, because they have a constitutional claim. Am I correct on that? You may think it's not a very good constitutional claim, but that isn't the question. The judge hasn't ruled on that, has he, or did I miss it? Your Honor, it is true that they say that they've pleaded an equal protection violation. Their pleadings on that point are bare bones, and in the motion to dismiss proceedings, we understood them to be saying that the equal protection claim only applied to the provider plaintiffs, not to the individuals. I've read in the response brief they think it applies to the individuals. Your Honor is correct. That isn't really for us to decide in the first instance on a limited appeal of a preliminary injunction. That's correct. We can vacate or affirm a preliminary injunction, and certainly our writing may give guidance to the district court, I have no doubt on that. But as far as what we can rule on, we can either vacate slash reverse the injunction or affirm it. We can't reach out and say, well, this section of your complaint is kind of bare bones, we don't like it, and so on and so forth. You would agree with that? I don't disagree with that, Your Honor. It would be fair in this case to simply vacate the injunction. Now, I think everyone is in agreement that if they don't have a private right, if the individuals don't have a private right of action under 823, then the injunction necessarily must be dissolved because they necessarily have no likelihood of success on the merits. But that doesn't go to the equal protection. Well, the judge only granted the injunction on the statutory standing and to the individual plaintiffs. So if we were to accept either that they lack standing or that they lose anyway for some other reason, then it would be correct to vacate the injunction. I agree with that. What I was concerned about is you also said we should dismiss them. And I had understood there to be a disagreement about whether they've asserted a constitutional claim, validity of it, so on and so forth, that the district court did not rule on. Yes, Your Honor. We made that statement based on our understanding that the individuals weren't pursuing an equal protection claim. We developed that under the motion for dismiss stage. They now claim that's not correct. Could I ask you, in your interpretation of Armstrong to overrule Wilder and language in O'Bannon and decisions of ours like Hood and Legacy in favor of HHS's ability to defund, as to that argument, we don't have the government's position in this case, but we do have the amicus brief from Gee. So your argument would not be consistent with the United States government's position as to what Armstrong did and didn't reach. Is that correct? Your Honor, I believe that's correct. The United States did not file a brief in this case. But you're familiar with their amicus brief in the Gee? I've reviewed their brief in the Gee case. That's correct. I don't think that the government properly appreciates the impact that Gonzaga and Armstrong had on the Wilder and Blessing analysis. And I think that's worth covering in some detail. Gonzaga illustrates how we are meant to apply the proper test. Gonzaga says that we are first supposed to look at whether the statute is phrased with an unmistakable focus on the benefit class. This is on page 284 of Gonzaga. For a statute to create such private rights, its text must be phrased in terms of the persons benefited. Now, the court provides an illustration of what it's talking about. It says that when a statute says no person shall be subject to discrimination, well, that can create a private right. And we see that in Title VI. We see that in Title IX. But Gonzaga explains that when a statute says something like no funds shall be made available to a state that's noncompliant, that does not create a private right. That's at page 287 of the Gonzaga opinion. And that's closest to what we're dealing with here. Now, Justice Breyer wrote separately in Gonzaga to fault the majority for displacing the Blessing analysis. But the majority disregarded Blessing and disregarded Justice Breyer's criticism. Mr. Hawkins. They disregarded. They cite Blessing several times in Gonzaga without critical language. Would you agree? Oh, I don't agree, Judge Southwick. I think the opposite. You agree they cited it several times and don't state they are overruling it? No. Judge Southwick, I don't think that's correct at all. The Court at page 282 and 283 addresses Blessing and says two important things about it. Number one, Blessing rests on the Wilder standard. And we now know that Wilder has been overruled. And second, the Court explains that the Blessing factors were both disavowed by the Penhurst decision and by Souter v. Artist M. It specifically calls out Blessing for supporting a, quote, loose standard. And then it says that Blessing's loose standard is no longer the law. That's what Justice Breyer criticizes and the Court disregards that. So I think the fairest reading of Gonzaga, and Armstrong confirms this, is that Blessing is no longer the correct statement of the law. At least the distinction in the asterisk footnote that the only thing repudiated is Wilder, not Blessing. Your Honor, the Court did not specifically say in the asterisk footnote anything about Blessing. That's true. But the remainder of the Armstrong opinion simply doubles down on the pronouncements that Gonzaga made in concluding that Blessing is no longer the correct statement. Why aren't they consistent? Why isn't looking for an unequivocal statement of a private right consistent with then adding these other considerations onto Blessing? Well, Your Honor, because as Gonzaga explains, those other considerations in Blessing lead to the wrong result. They don't get at what Gonzaga and Armstrong say we're supposed to figure out, which is clear and unambiguous intent to create a private right of action. Blessing focuses on things like the intent to benefit a plaintiff. We know that's no longer the law. Blessing focuses on things like whether the right is vague and amorphous. We know that that's no longer the law. And also the right must be phrased in terms of mandatory rather than pregatory language. That is an important consideration. I'll certainly agree because that goes to whether there is a clear and unambiguous statement of intent to create a private right of action. Counsel, do you have three different theories by which you believe you win? There's this Gonzaga-Armstrong theory that there's no private right of action, and through that, that's the first one that you've been talking about extensively, right? Yes, Your Honor. And then there's the straight-up O'Bannon theory. Are you proceeding on that theory or are you not proceeding on that theory? We are, Your Honor. Your Honor's dissent from denial of en banc in Guy we agree with fully. We embrace the O'Bannon theory. That is our second path. And do you have the third theory that qualified is that they're not qualified, and that that's a separate one even if there is a private right of action? Is that the universe? Are those your theories? That's not quite the universe. What is the universe? The third category are the issues that we briefed at the panel stage in this case. On the merits, they're not qualified. The district court applied the incorrect legal standard. It should have been arbitrary and capacious review. The review should have been limited to the administrative record. Of course, we've raised the Pennhurst argument as well. This is a spending clause statute. Under the Pennhurst clear statement rule, Congress cannot withhold funds for ‑‑ excuse me, Congress has to speak clearly and unambiguously to foreclose a state's interpretation of a statute under the clear statement rule. So that's an overlay before you get qualified. Is that ‑‑ where do you put that one? Your Honor, that's an independent ‑‑ That's a freestanding independent argument. It's a freestanding independent argument. That is the argument that Senators Cruz and Cornyn made. Do you ask us to take, to decide the case on all the theories, like that very brief that you're citing asks us to do? No, Judge Elrod. We would ask the court to decide this case the same way the Eighth Circuit decided Doe's v. Gillespie. Judge Colleton's majority opinion in Doe's v. Gillespie is the roadmap that we would ask this court to adopt in resolving this case. Well, then we wouldn't do O'Bannon, the Shepard route. The court need not do that. We think that the prudent course here is to adopt the Gonzaga and Armstrong framework that Judge Colleton discussed in the Eighth Circuit majority opinion. It's prudent to do that here, Judge Elrod, because this issue arises frequently. And you know I'm not foreshadowing by any means. I'm just trying to figure out what your position is of how you would see this case. Well, Your Honor, we would be happy to take a win any way we can get it. But we think the appropriate way to do so would be to fall. Actually, you and your opponents agree on that statement. Yes, we do. I'm sure they would take it. But do you agree with the statement in that brief that qualified means whatever the state says, and so if it doesn't want to be associated with the party because it perceives them to be racist or eugenic or whatever reason that I'm citing from that brief that you were referring to, that that is a satisfactory reason to have denied this straight out? Your Honor, I'm not sure we agree with that statement fully. That statement is based on cases saying that we can exclude the Ku Klux Klan from our adopted program if we want to. That is not what we're arguing here at all. That is an argument the amici have made. We think that the cleaner way to resolve this case—may I finish answering? Go ahead. We think that the cleaner way to resolve this case is via the Gonzaga-Armstrong analysis. All right. Thank you, Mr. Caucas. You've reserved your rebuttal time. All right. We'll hear from Ms. Andan. May it please the Court. Jennifer Sandman for Apeliz. I would like to very briefly discuss three topics, the private right of action question, why it is clear that the free choice of provider rights of the DOE plaintiffs are violated here, and the practical effect on patients if the Medicaid terminations are allowed to stand, and then I'll waive the remainder of my time—my uninterrupted time, that is. First, whether there's a private right of action to enforce the free choice of provider requirement just is not a close call here. Supreme Court precedent dictates that the test is the three factors of a Gonzaga blessing. This Court applied those factors just last year in legacy. The free choice provision clearly passes that test. It's clear who the right is granted to, any individual eligible for Medicaid services, and it's clear what is being granted, the right to services from any qualified and willing Medicaid provider. That is the paradigm individual rights-granting language that the Gonzaga Court said is required, and it's present here. And the other two factors of the analysis are met as well, because the standard for what qualified means is that it's clear and enforceable and that the right is mandatory on the state. So for these reasons, the Court got it right last year—excuse me, just two years ago when it decided yee, and the courts of appeal are nearly unanimous that this provision, the free choice provider provision, is enforceable under Section 1983. The Sixth Circuit, Seventh Circuit, Ninth and Tenth Circuits all agree, as well as numerous district courts. Now, the state asks you to decide otherwise basically on the grounds that the free choice provider requirement is contained within a directive to HHS about what obligations a state plan must meet to receive federal funding, and because HHS is authorized to withhold funds if the state plan substantially fails to comply with that requirement. But those factors are true for all Medicaid Act claims. There's nothing unique here about the free choice provider requirement. But this Court has repeatedly found that the Medicaid Act does have provisions that are privately enforceable, not only in yee, but also in legacy, in Romano in 2013, in Hood in 2004. So deciding that a Medicaid Act claim isn't privately enforceable just because it's part of a directive to HHS and HHS can withhold funds would really upend the well-settled jurisprudence of this Court. Moreover, Congress passed the suitor fix, that's Section 1320A2, and that provision, that statute expressly states that a Medicaid Act claim cannot be found not to be privately enforceable just because it's in the form of a state plan requirement. So Congress has spoken directly on this issue and foreclosed the argument in the 1983 context. So for this reason, the question of whether there's a private right of action is an easy one. Second, I want to briefly address the merits of the termination. So we know that a right has been granted by Congress. We know from the Gonzaga Blessing Factors that that right is intended to be individually enforceable, privately enforceable. Now, if that right is to mean anything, it has to mean that these terminations cannot survive because they have nothing to do with whether these three providers are qualified to provide Medicaid services. That's true for all three of the providers. It's especially true for Greater Texas and South Texas. Now, I want to drill down on the situation of the three different Planned Parenthood affiliates here because they really are differently situated. So the video that's the basis for these terminations simply has nothing to do with two of the three providers that the state is attempting to terminate here. That's Greater Texas and South Texas, and between those two affiliates, they operate 24 health centers across the state. They're not on the video, and the state agency has never claimed that they did anything wrong. Their conduct just is not at issue here. The district court also found, and the uncontroverted evidence is clear, that they're separate corporations. They have their own CEOs, their own boards, their own finances, their own operations, their own decision-making, and these accusations just have nothing to do with them. The state's claiming that it can terminate these independent entities from Medicaid solely because they're affiliated with Planned Parenthood, and the definition of affiliated that they rely on is literally overlapping names. It's that they share part of the name, the name Planned Parenthood, but that is not permissible under federal law as a basis for a Medicaid termination, including because of the free choice of provider requirement, and those arguments are laid out in greater detail in our panel briefing than they are in the on-bank briefing, so I wanted to flag that for this court, the panel briefing at 28 and 43 to 46. Focusing on Planned Parenthood Gulf Coast, the district court heard three days of live testimony before granting a preliminary injunction, and it reviewed the eight hours of video footage in its entirety in addition to that three-day evidentiary hearing. It made detailed findings in a 50-page opinion that there was not a scintilla of evidence that Gulf Coast violated any medical or ethical standard. Rather, this termination is the latest in a long series of efforts by the state to terminate Planned Parenthood providers from publicly funded health programs, regardless of the cost to patient care, and I also want to flag for this court that the specifics of the false allegations in the video are addressed in much greater detail in the panel briefing as well at 19 to 27 and 46 to 51. So, finally, one more brief topic. To keep the focus where it should be, it's important to remember that what the state is trying to do and what's at stake here is whether thousands of the poorest women and men in Texas can get basic health care at high-quality Planned Parenthood health centers across the state, 30 health centers in all. So I want to be very clear that there's no confusion. Medicaid does not pay for abortion except in extremely limited cases of rape or incest or when the woman's life is in danger. Medicaid coverage for abortion simply is not an issue in this case, and I also want to be clear that patients in Texas have to be desperately poor to qualify for Medicaid. The record shows that a single woman with a dependent qualifies for Medicaid only if her income is less than $153 a month. So you're really talking about the poorest of the poor, and the record is also clear there are not other adequate places for these patients to go to access basic health care. One additional brief point, that the potential impact of this case is bigger even than Texas because the outcome of this case could also determine whether Medicaid patients in Louisiana and in Mississippi can get health care services at the Planned Parenthood health centers in those states. So the practical impact of this case is real and severe. And for these reasons, the preliminary injunction was rightly decided and should be affirmed, and I'll now invite questions. Ms. Salmon, good morning. To what extent does your argument that 1396A contains rights-creating language, to what extent does your argument depend on the use of the word individual in the statute? Your Honor, I think the word individual is critical because that's exactly the type of individual rights-creating language that the Supreme Court was clear that is the obligation of the Court to look for in Kinsaga. Are you aware of how many times the word individual is used in 1396A? Your Honor, it's not only a question of the use of the word individual. But are you aware of how many times the word is used in 1396A? No, Your Honor, I'm not aware of a specific figure. But I do want to be clear it's not just a question, Your Honor, to be clear, of whether the word is used. It's a question of the way that it's used, and it's used here in a way that's clear. Congress is saying who gets the right, is any individual eligible for Medicaid, and what the right is. It's the entitlement to services for many people. So can you give me an example of those two factors together, Your Honor? There's individual rights. Can you give me an example of when the word individual is used in 1396A where it doesn't create, doesn't confer a private right of action? Your Honor, I'm not prepared with that specific information. But I think if the implication here is that this Court would somehow be opening up a new pool of individual privately enforceable rights, that's simply not accurate. This Court's jurisprudence in this area is already well settled. It comes directly from the Supreme Court's jurisprudence, which is clear that what you look for are the Gonzaga Blessing factors. Where they're met, this Court has not hesitated to find an individually enforceable right, as it did in Legacy, in Hood, and Romano. Could you help me a little bit with the interplay between A23 and subsection P, and I think 1320? In other words, states do have the affirmative vital obligation to make sure all these health care providers are qualified and don't have rodent infestation or whatever. And so it would seem to me that your opposing counsel did say, oh, well, HHS can do this. And I'm not persuaded by that. But he additionally said providers must vindicate themselves through the administrative process. We wouldn't want individual beneficiaries to be able to litigate the entire host of critical state health determinations. And that really – and I'll make this a question – is asking you what's your limiting principle speaking to what we're calling the end-run problem, the bypass problem, where we would get a robust administrative record before – litigated by the provider itself that's saying that it's still qualified. How do you accommodate for the state obligation to be very robust there? So, Your Honor, I think there's really two different strands embedded in your question, Judge Higginson. So one is what is the interplay between the pre-choice of provider requirement and P1 and the general ability of the state to run its own Medicaid program and the proper basis of determination? And the other is what is the impact on this case and on the court's analysis of the fact that there was no administrative appeal from providers? So I'd like to address those separately, if I could. And I'll start with the second. You know, Congress enacted the pre-choice of provider requirement. And for the reasons that I said earlier, it's clear what the result of the Gonzaga Blessing analysis is for that requirement, which is that there is an individual enforceable right, and that right belongs to the patient plaintiffs. The patient plaintiffs did not have any option to vindicate that right except for the 1983 action in the federal court. And that's the right that was given to them by Congress, and that's the way that they have attempted – are attempting to exercise that right here. There is no administrative process available to patients. The only way they get to vindicate that right is this claim under 1983 in federal court, exactly as Congress intended. Now, there's no obligation to exhaust administrative – How does that differ – excuse me – how does that differ from O'Bannon? So, Your Honor, O'Bannon addressed a very different situation. No, the facts in O'Bannon were precisely the same as those here, that the nursing home had – well, they weren't exactly the same because plaintiffs are now smarter than they were then. But in O'Bannon, the nursing home had challenged its disqualification by the state authorities in the ongoing administrative proceeding, which had not concluded, if I recall correctly. And the plaintiffs, rather than attempt to intervene in that proceeding, went directly to federal court. And in light of that, the federal court said they had no right. Your Honor, I would like to explain the ways in which I think O'Bannon is significantly different from this case. Number one, the residents in that case did not bring any free choice of provider claims. So I just want to be clear that the only way that the free choice of provider requirement was – Well, what was their claim then? You don't have due process, a violation of the due process right, unless you have a right. So what exactly was the basis of their claim, if not 23A? Interestingly, Your Honor, I looked at the briefing from the Supreme Court, and they literally had zero citations to the free choice of provider requirement. They tried to identify the property right that they asserted as a basis for their procedural due process in a number of places. Free choice of provider was not one of them. But the court doesn't say anything about the insufficiency of their briefing. It does say, here is the governing rule, which is Statute 23A. I think the most critical distinction about O'Bannon, Your Honor, is that there was no claim there that the state was closing the home for invalid reasons. The Supreme Court took it as a given. It's an analysis that the termination was justified. There was no meaningful dispute that the nursing home had violated the standards for a skilled nursing facility. And the thrust of the patient's complaint, the resident's complaint, seems to have been that they wanted the opportunity to be heard in the administrative proceeding about the ways in which being transferred to a different facility would be bad for them. So that could be part of the equation of the termination dispute. And these plaintiffs were— They did not dispute— And these plaintiffs were— —their own violations. Excuse me. Pardon me. I beg your pardon, Your Honor. And these plaintiffs are contending that the ability to go to another Medicare provider for the same non-abortion-related services would disadvantage them. Again, just like O'Bannon. Your Honor, we're arguing that in the context of why injunctive relief was important and appropriate. But I think the core distinction is that the DOE beneficiary plaintiffs here are very clear that they are challenging the basis for the termination as having nothing to do with Medicaid requirements. That was simply not true in O'Bannon. Let me ask you. I think it's in your brief, en banc brief, that you point out that in— I believe it's subsequent to Armstrong or at least subsequent to Gonzaga. There have been some 27 instances in which courts have purported to decide the scope of individual claims under 23A and that in 13 or 14 of those instances, the courts have found implied private rights of action. How do you explain courts' failure to find implied private rights of action in the remaining cases? Your Honor, if I understand the court's question correctly, the question is what was the analysis and what was wrong with the analysis of the courts that have found there was no private right of action under Section 23A? I didn't say what was wrong. I said do you disagree with those and why? Your Honor, I believe there were only two cases that have come out that there was no private right of action. One was a district court case that I don't want to misspeak, but I believe may have been out of Utah with essentially no analysis, and the other was Dose v. Valesky, the Eighth Circuit case. Well, they're not all—I'm sorry if I miss—they're not all about 23A. They're about—well, they're about provisions of 1396. Okay, they're about provisions. In other words, the Medicaid requirement for states to qualify for the program, right? And there have been two dozen cases where there was implied private rights of action under provisions. That was argued, and in half of them, the right was implied, and in half of them, the right to proceed in federal court was not implied. Now I understand your question. I beg your pardon, Your Honor. So I think that the Supreme Court law is very clear that with Medicaid Act provisions, as with any other statutory provision, the court, when it applies the Gonzaga Blessing factors, applies them on a provision-by-provision basis. So, for example, Section 30A of the Medicaid Act does not create a private right of action. You know this from Armstrong, in part because it lacks entirely the type of individual rights-granting language that's present. But then—I mean, I'm sort of curious that you've never mentioned Armstrong in your argument in order to try to distinguish it. Let me do that, Your Honor. Armstrong was a very different case. So Armstrong basically, number one, was not a Section 1983 case, and that's an important point here, part of the reason that the plaintiffs in that case did not bring a Section 1983 claim was, it appears, the lack of individual rights-granting language. So the issue in Armstrong was not what analysis applies under Section 1983 in determining whether there's a private right of action. It's what applies when you're attempting to read a private right of action under equity or the supremacy clause and how that analysis should proceed. That's very significant because the court's analysis emphasized, in the majority opinion, that the supremacy clause does not create a clause of action. Section 1983 does. This was also emphasized in Gonzaga, and it was critical in Armstrong as well. And the fact that the Armstrong plaintiffs likely did not bring a 1983 claim precisely because of the lack of individual rights-granting language was highlighted at 1388 footnote in the Breyer concurrence. So number two, Armstrong did not address 1328-2, the suit or fix, and that's not surprising because 1328-2 is closely tied to enforcement of the Medicaid Act under 1983. So 1328-2, the suit or fix, was not at issue in Armstrong. The Supreme Court did not address it, had no cause to address it, but it's a binding enactment of Congress that precludes the argument that the state is making here. And that's clear if you look at how courts have analyzed Section 1983 claims, Medicaid Act claims post-Armstrong. It's unchanged. They still look to the same three factors of Gonzaga and blessing that they looked at before. Ms. Sandman, I'm sorry to interrupt, but this is just jumping off of what you just said. You've continuously referred to the Gonzaga blessing factors. Yes. And I assume you mean the three factors under blessing that we've seen briefing on. Yes. My specific question is, since Gonzaga, has the Supreme Court applied those factors in a case? And if so, which one? Gonzaga was 2002, so that's 17 years. Has the Supreme Court ever applied those factors in an implied right of action, private right of action case? Your Honor, I do not know the answer to ñ I don't want to misspeak as to whether the Supreme Court has had cause to apply those factors in this context. This Court certainly has most recently in legacy. Well, sure. So in Gonzaga, the Supreme Court articulated those factors at page 283 of the opinion, but by my reading, to disapprove of them. Do you disagree with that? Your Honor, in Gonzaga, what the Court was basically saying is that it is focusing on the first factor, that it would not apply it as ñ it was correcting the analysis in that the blessing court had applied. So I think what the Gonzaga court was basically saying is in blessing, the Supreme Court had sometimes been understood to recognize a broader zone of interest as being an appropriate basis for an enforceable ñ a privately enforceable right. Well, I understand that. I understand that's your argument. But what the Court said in Gonzaga is that it singled out some language in our opinions that could be read to suggest something inconsistent with Gonzaga, and it quoted at length the blessing factors immediately afterwards. So I don't understand how that's anything but a disapproval of those factors. Your Honor, I would read that case differently, and I think that it's clear from this Court's recent case law that it has read it differently as well, as have the other courts that have continued to apply post-Gonzaga and post-blessing the same three-factor analysis. I do want to return to the question that Judge Jones ñ Can I shift gears for a moment? Yes. Assuming the video is accurate, I obviously get that you challenge it specifically, but if the video is accurate, would that make Gulf Coast not qualified? No, Your Honor. It absolutely would not. The Supreme Court ñ excuse me, the District Court reviewed the entirety of the video. It also heard three days of testimony on the subject matter of the video, and it made detailed conclusions as to why the video provided not one scintilla of evidence of any wrongdoing by Gulf Coast. Can you rephrase if the video is not just qualified? If it was actually established, then this is clearly not the case. And you're not ñ If it was established that there had been ethical and medical violations in connection with the Medicaid Act, then we're not disputing that those violations could be a proper basis for termination.  No, I understand. So the issue here, then, what you're focused on is that it's merely an investigation rather than a formal judicial finding. My question is ñ and this is what troubles me about your position ñ forget about this case and just speak more broadly about protecting medical patients. If the State is confronted with serious allegations ñ again, there's nothing to do with the State, hypothetically ñ a provider that is badly mistreating patients and is under investigation for that, is your position that the State can't take preemptive action to distance itself from that particular provider? Your Honor, I don't think there's any cause for the Court to reach that question today because I think what the Gee opinion turned on ñ I'm trying to figure out what your standard for qualifying is. Yes. So let me speak to that, Your Honor. I think that what the Gee opinion in the panel of this Court emphasized, I think appropriately, that there was simply no factual nexus between the allegations and the evidence. What if the provider were an accused medical student? Your Honor, I think there's two questions. Number one is, is the misconduct that a provider is accused of the type of misconduct for which they can be terminated from the Medicaid program? And number two is, was there a sufficient factual basis that it was ñ there was a basis to conclude that that rendered ñ that that actually happened, that that rendered the provider unqualified? But that wasn't litigated in Gee, was it? I beg your pardon? Because if Gee somewhat conceded qualified and moved with this narrow definition of qualified. So that wasn't really litigated in Gee to say that this has already been determined, that it's not enough. Your Honor, I think what the panel's analysis made clear is that the State can't just label something as constituting a provider being unqualified if there's no factual or legal nexus. And in Gee, both of those pieces were missing. Right, but does it have to be correct? Does the State have to be 100% correct? And do we get to second-guess the State? Or if it has a basis and it brings forth some facts, do we just like with any other agency give deference to that? Why is there no deference? Because they're doing an administrative proceeding and they could be wrong, but they don't have to be right, do they? So I think that, Judge Elrod, I think part of what you're asking here is what's the appropriate standard of review when considering a determination. And for all of the reasons that are in our briefing, I think that arbitrary and capricious review, which is what the panel opinion would have applied, is not the appropriate standard. However, if this Court does apply that standard, we would withstand Gulf Coast's termination, I think would withstand scrutiny even under that standard because there was simply no basis, not one scintilla of evidence. How is that? I don't understand how there's no evidence. You're not just talking about the video, are you? Your Honor, I'm talking about the distorted claims that were made on the basis of the video. No, but there's also the congressional report that discusses violations of the Texas Penal Code, for example, and unaccounted for money, and the lawsuits in the other jurisdictions that were settled and some allegations of fraud that were never... They weren't proven, but there is some evidence. It may not be conclusive evidence, but you can't say it's no evidence, can you? Your Honor... Those are all in the administrative record, aren't they, all the things I'm talking about? Your Honor, some of them are, and I'd like to address them individually, but before I do, I also want to say that they were considered in great detail by the district court. The district court made findings. This is the function of the district court. Excuse me, Ms. Sandman. Excuse me, Ms. Sandman, you've got some inconsistencies going there because the district court just said the standard of review was de novo and that was why he held a trial, but if it was de novo and he held a trial, he then excluded or disregarded all of the testimony that the state offered. Your Honor, that is factually incorrect, so I would like the opportunity to... It is not factually incorrect because in his district court opinion, he said that. Your Honor, what the court said... Well, there's a difference between a district court not considering testimony and a district court not crediting the testimony. There was some state testimony that the district court did not credit, Your Honor. What the district court did not consider, however, and I want to be clear about this distinction, is the post facto justifications that the state came up with to, after the fact, try to justify... But that... But again... ...that were not in the original notice of determination. But then you're tying... Then you're being unfair to the state because if what you're saying is the state's administrative decision was wrong, then you need to judge that in terms of ordinary administrative decision making, which is that you're confined to the record before the agency and you review it under the arbitrary and capricious standard. You can't just say, plaintiffs get to attack whatever they want to attack and the state has no right to respond in kind, which is what happened here. Your Honor, I do think that what the court... what the district court did in weighing the state's evidence and the plaintiff's evidence was an appropriate way to proceed. There's a difference. Texas law is clear, as is federal law, that an entity being terminated from Medicaid has a right to notice of the basis for the termination. So the district court said it was not going to consider justifications for the termination that were not included in the notice. However, it considered all... That's not an accurate reading of the record. And I just want to make one other point clear, and that is don't tell us about inaccurate videos. Those videos were never challenged by the plaintiffs for accuracy. None of the plaintiffs viewed the videos, not one who testified at least, and we went through that very thoroughly in rendering the panel opinion, and I refer to you to the panel opinion. Your Honor, I know my time is running short. I do want to address... Can I clarify? I apologize, but I want to make sure I got an answer to my question. If you have a provider who's accused of mistreating, molesting a patient, accused, are you saying that that person could be disqualified or could not be disqualified? Your Honor, I don't think there's any need for this court to reach that question, but I think that what's clear is that they could... I'm not sure they're here. That's merely an investigation. They're not a finder. It's really not, Your Honor. The thrust of our complaint here as to Gulf Coast is that there was simply no factual basis for the claims that they made. They're unsupported by the evidence. We had a finder of fact. The district court looked closely at the evidence and concluded there was not a scintilla of evidence. And it's not only the district court. The... Your Honor, I think the thrust of the distinction from that situation... To me, the question would turn on whether there was a factual basis to conclude that there was... that the terminated entity was guilty of wrongdoing. If there was a factual basis to conclude it, that's very different than here. And I do want to just be clear that in Texas, joint investigations of the Texas Rangers, the Houston Police Department, the Harris County D.A., all cleared Gulf Coast of wrongdoing and actually indicted the extremists who made the video. A dozen investigations by other state authorities found no evidence of wrongdoing. Counsel, I do have a question about the video. Hold on one second. I'm going to stop you with going there. I was going to go back to Judge O'Rourke to see if you had completely answered the other question that you had, and if you didn't, I'd like for you to succinctly complete the answer to the question that she asked. This is the question about the congressional report and the other data that is in the administrative record to support this in addition to the video. And then my subsequent question is, there seems to be no evidence cited in the briefs that the videos are spliced or tampered with. In fact, you ask us to take judicial notice of an editorial in a medical journal in a Huffington Post article. We can't take judicial notice of those things, can we? And can you please answer about the congressional report? Your Honor, as to the congressional report, the only claim of wrongdoing that came out of the SIP report, I believe is what the Court is referring to, was a supposed misrepresentation. At trial, the state essentially chose not to defend that claim after their own witness... But we're looking at the evidence at the time they're making the decision to disqualify, not at the time after the fact, whether we learn it's ultimately true or not. We're trying to say, did they have a good-faith basis in making their determination, and was it based upon something? We're not trying to decide whether ultimately Planned Parenthood sold tissue. That's not the question before us today. Your Honor, there absolutely was no good-faith basis to... For example, that there was a misrepresentation. The inspector general, who is the decision-maker, testified he had no idea if that was true or not. That was his testimony before the district court. That has to mean he did not have a good-faith basis for termination on that ground at the time of the termination. OK, and what about the... Is there any evidence in this record whatsoever that those videos are tampered with? Is actual evidence in the record as opposed to statements in the brief? Your Honor, the record is silent either way. There is no proper authentication of the video, and there is no evidence that... Well, you wanted us to look at the district court record, and the district court record does contain authentication of the video, doesn't it, by some organization that does work for all kinds of prominent companies? Your Honor, there is no evidence in the record that we know there were multiple versions of the video. There was nothing done in the district court record to link the authentication to the version of the video... That is inaccurate according to the record. All right, can we... We're sort of down into the video, so I think we've fairly well exhausted your time on the merits and cover the lie. I'm going to declare that your time is concluded. Thank you for your argument. All right, we're back to you, Mr. Hawkins. Senator Boe. Thank you, Chief Judge Stewart. Just a few points. 99.7% of Texas Medicaid patients receive their health care at a facility other than Planned Parenthood. Planned Parenthood only serves 0.3%  Why is there this argument number three, then, that says that all these very poor women will be without health care if we are to decide the case? And that was prominent argument number three. I think that argument is belied by the record. At page 4518 of the record, there's evidence... Excuse me, page 4447 of the record. There are 357 providers within 5 miles of the Planned Parenthood facility in Houston, 62 in San Antonio, and 50 in Dallas. Do providers have federal judicial recourse once they've exhausted the administrative remedies Texas gives them? Your Honor, providers are certainly able to contact the Secretary of Health and Human Services... No federal judicial recourse at all? No, Your Honor. If the provider exhausts state administrative remedies, of course, the provider has state judicial remedies to challenge that process. So there is judicial review built into the system, but, of course, the provider plaintiffs have never availed themselves of that. They've instead enlisted their patients to bring the suit. And they couldn't here, in your view, because the time has passed? That's correct. They have forfeited their right to do that. So this is an all-or-nothing situation, this case? That is correct, Your Honor. Not necessarily this appeal? I'm sorry, Your Honor. Not necessarily this appeal, because, as I said before, it's a limited appeal of a limited ruling, the preliminary injunction. They have forfeited their right to administrative review. Mr. Hawkins. 23A, what did it need to say to create an individual right unambiguously? I mean, a lot of practical problems, and we've been discussing them here about the in-run around administrative remedies and whatever, but what we're looking at under Gonzaga and Armstrong is an unambiguous statement. What would remove whatever you think is the ambiguity in A23? Oh, Your Honor, there's any number of... Does it have to say you have a right to sue, or is it just enough to talk about the individuals and their rights to certain kinds of treatments of their choice? No, the right to sue language, Your Honor, I hypothesize that would have done it. There's any number of phrases that Congress could have used. But even without a right to sue language, could statutory language create an individual right that would support the Armstrong-Gonzaga analysis? Of course, Your Honor. Take the First Amendment. The First Amendment doesn't say anything about right to sue. We all agree that can... Well, I'm talking about the Medicaid Act. What would be necessary in the Medicaid Act, let's talk about A23, what phrase, what word would you have had Congress say to create such a right? Well, Your Honor, there's no magic words that are required. Congress could have simply said that the individual... or that the individuals in the Medicaid program shall have the right to challenge the state's determination of who is qualified. Congress could have just added those words in and that would change the outcome here. But Congress did not. What Congress did do does not create an individual right. I'd like to briefly address the Suitor Fix, Section 1328. That statutory provision, for the reasons set out by Judge Colleton in Does v. Gillespie, is talking about something different. That statute says that when there's an action to enforce a provision of the Social Security Act, a court should not declare that provision unenforceable simply because it arises in the context of a state plan. But that's not the Gonzaga-Armstrong inquiry, which is whether there is an unambiguous congressional intent to create a right. And the best evidence that the Suitor Fix, the 1328-2, is not relevant to this proceeding is the fact that the Supreme Court ignored it in Armstrong. We reviewed the Armstrong briefing. The United States and the Respondent both raised 1328-2, the Suitor Fix. They argued its applicability. The Supreme Court ignored it entirely and instead told federal courts to focus on the phrasing of the statute and whether it's directed at a state plan. That is the best evidence that 1328-2 has no applicability. I would also note that the Eighth and Ninth Circuits have declared 1328-2 confusing and ambiguous, and we agree. Mr. Hawkins, is it the state's position that 1396-A, which has these 83 provisions, is not individually enforceable by anybody under any of the provisions, or that 23-A, which we're concerned with here, is not enforceable by individuals? The latter, Your Honor. We are only here to talk about 823. I'd like to note that there have been only two times since Pennhurst that the Supreme Court has found a private right of action in the spending clause statute. One was in the Wright case. That was about the Public Housing Act. And Mr. Hawkins, to pick up on that, since Gonzaga has the Supreme Court, any Supreme Court case ever articulated and applied the blessing factors? I cannot think of one, Your Honor. The Wright decision indicated the language could not be clear. May I finish this point? The Wright decision indicated the language could not be clear, and it noted there was no alternative enforcement mechanism. The second time was in Wilder, which has now been repudiated. Unless the Court has any further questions, we would ask the Court to reverse. All right. I think the Court probably would have a lot more questions, but that's not the test. We're out of time. Thank you to you, Ms. Hawkins, and Ms. Salmon for responding to the questions. The case will be submitted for us to decide. We will take a five-minute break to respond.